May it please the Court, Thomas Hester on behalf of appellant Marvin Goree. In this case the state used psychological coercion to overcome Mr. Goree's free will and obtain inculpatory statements. It did so by sending the one person that Mr. Goree, who was intellectually and emotionally limited, trusted and depended upon, to the state. to covertly record her interrogation of him in the county jail. It did so by exploiting Mr. Goree's paranoid schizophrenia for which he had not been treated in the more than three weeks he'd been at the county jail. And the state's agent, Kimla Dobbins, exacted those statements by repeatedly threatening Mr. Goree that he would never see her again unless he confessed his involvement in the murder that she was sent to investigate. And by promising him that she would marry him if he came clean so that they could have a fresh beginning. And that she would effectively drop the charges of kidnapping and domestic violence that were pending against him and for which he was actually jailed at the time. In the face of this questioning, Mr. Goree began by immediately asking her to put money on his books so that he could see the doctors at the county jail and get back on his Thorazine and Benadryl. She proceeded through an hour-long interview with him that was taped using a recorder that was provided by the Portland Police detectives who drove her to the jail. After reviewing that tape, those officers thought they didn't have as much as they wanted and that it made sense to send her back again. And let me stop you there because one of the things that suggests to me, I mean, he didn't really come clean. He was arguably bent but not broken. I mean, he wouldn't come forward. He wasn't explicit with her in acknowledging what the officers were hoping he would acknowledge. Does that suggest that, in fact, his free will wasn't overwhelmed? He was still being very cagey and cautious in terms of what he's willing to admit to and what he wasn't? I don't think it suggests his will wasn't overborne. I think going through the transcripts, which are part of the excerpt of record of both of the hour-long interviews, it speaks very well to how Kimla Dobbins played him, exploited his deficiencies as well as his lack of medication. It is true he didn't completely confess in either of the interviews. In the first interview, he acknowledged being at the scene. He acknowledged an assault, essentially, on the murder victim, but said he was alive when I left and that I was there with Elvis Parker, or Easy Parker, and his brother, Blaine Ross, Rico, who ended up being two witnesses against him at the trial. In the subsequent interview, a week later, when she returned, and again, it's this pattern of, you'll never see me again, but baby, I want to make it clean. I want to start together, but you've got to tell me. You're not telling me everything. There, she's armed with a newspaper article that the detectives have given her about the crime. She reads in that article. She says, I've talked to people, and implicitly it's Elvis Parker and his brother, and I've heard things. If you don't tell me the truth, I'm going to know, and you'll never see me again, but if you tell me the truth, I'm going to marry you. There, he does a lot more, and she elicits a lot more from him. She elicits the statements that I think tie up the state's case and demonstrate that the error I'm alluding to is harmful. In particular, he says, the guy came out, and I came out to let his cat in. There was some reference to that before, but I ran at him. This time, he says he's alone. No one else is with him. I tackled him. Ultimately, she gets him to say, I slammed his head into the floor, and things that are exactly as the guy was seemingly killed, and the one sort of independent witness at the trial ultimately is a neighbor who gave a description to the police. The description doesn't fit Mr. Gorey physically, but the description of seeing… It doesn't fit him in any way. Well, it fits the behavior that he acknowledges in the second case. In that respect, it demonstrates the harmfulness. You're right. The size, race, age, nothing fits. His testimony was not damning in and of itself, but coupled with what she exacted in the second covert jailhouse interrogation, him saying, when he came out, I charged him, I rammed him into the floor, that coupled very well with what the neighbor observed and what the only other independent witness… What I have trouble with is figuring out how one can conclude that his free will was overcome. What made this less than a voluntary confession? You've got an individual who is deeply mentally impaired. He has an IQ of about 60. He's a paranoid schizophrenic, apparently lifelong. He's not being treated with his medications. He is highly dependent on Kim Woodovans. She brought him to Portland after sort of taking him down the street in California. She… She took him in. She lived with him. He lived with her a couple of weeks or more, and then she moved him to another city. All of those things are pretty much a father record, but… And there's no doubt that the police knew she was the one person he would talk to and confide in. What makes it involuntary? What the Supreme Court has told us in a series of cases is that you look at the individual, in the Trapezoidal Circumstances Analysis, you look at the individual characteristics of the person being questioned whose will is at issue. In this case, Mr. Gorey's characteristics are that he is a highly mentally retarded individual with psychiatric problems who is deeply dependent on this one person. He's a paranoid schizophrenic who only trusts her, and the state actors, the detectives, the agent of the state, which the state court found Ms. Dobbins was, goes in and says, you will never see me again unless you tell me you did this. But I'll marry you, baby, when we do this. Well, you didn't say, unless you tell me you did this. You said, unless you tell me the truth. Unless you come clean. That's right. That's right. Yes. But it's very clear that, I mean, you're correct in that characterization. She says it different times. And when he says, I didn't do it, or denies it, she says, you're not telling me the truth. I know things. And she breaks him down. Over the first time she gets statements, not quite enough. We'll wait a week and send him back, give him another week off his meds. At least that's what happens, and the state's well aware of his condition. He's asked for his medication. I would suggest to you that if you look at Connolly, for instance, Colorado v. Connolly, where the Supreme Court said in a 5-4 decision, this isn't enough, because the state didn't exploit his psychiatric problems. This is exactly the opposite. Well, you're relying, I think, on the fact that that was a period of time when he didn't have his medication. And I think you want us to read this record to say how long that period of time was. But this record isn't definitive as to how much time he had been without his medication, is it? Well, the record reflects that he was arrested on November 18th. He was first interviewed by the detectives on November 20th. They didn't get anywhere with him. It was December 1st when they interviewed Ms. Dobbins for the first time, the detectives, that is. They set up the first interview for December 10th, so at that time it had been 23 days, I believe, at least, that he had been off his medications. The next interview was a week later, so 30 days at that juncture. So we do know that. That is, I think, demonstrated by the record. Sure it is, but here's what the problem is, at least you can tell me why it isn't the problem. The reason she was doing what she did may not have been because she's a police agent. It may have been because he had threatened her, had scared her half to death. And she had personal reasons that she may have wanted to see him where she knew she'd be safe from him as a person. And so she did it. So you can say she's a police agent because the record does reflect that she was, but she had some individual reasons why she wanted to see him in some deep difficulty. And you talk about how long he hasn't had his medication, and it's true that he hadn't had his medication, but it's also true that his resistance wasn't down, even without his medication. He asked her one time. He thought she was working for somebody else, and he asked her about that. He had his wits about him. Well, he certainly was, he still was paranoid. He was, later in the record, it shows he was hallucinating. You're absolutely right that she had her own motivations, and those motivations would have allowed her to be impeached as a witness at the trial just based on the admissions she claimed he'd made, which were much more innocuous, but for these tapes, which are there for harmful error. But take a look at one of the tapes at ER 964. Here's a man whose free will has been overcome by the seductions of Dobbins. He doesn't know what he's saying. He's saying anything possible just to placate her. And here's Gorey saying, but what you have to do is put it in on the company card. What I'm going to try to do, I won't be able, I can beat the robbery three. I've got the time served on that, Dobbins says, okay. Only serve 90 days, that's no problem. What I have to do is beat the burglary. This is a man who's talking about strategy for his defense, and you say his will is totally overcome? I'm saying that his statements are absolutely involuntary as to this confession. Yeah, he's talking about the parole matter in California there, and certainly he makes some rational statements. I'm not saying he's morally psychotic. I'm saying that… Oh, his will is overcome only as to the hogtie murder of McDonald. Well, his will is overcome in terms of exacting the statements that she exacts, and I think you can pick out snippets, but if you look at the entirety of it, I do believe that it's clear, and there is a factual finding by the state court. She's the agent, so although she had other motivations… No, I'm suggesting the record says she is, she is. I'm not suggesting otherwise. I will conclude by saying I believe that if you look at those transcripts of the two interviews, you look at Colorado v. Connolly, this has exactly what the Supreme Court said was missing there. You look at Spano, the exploitation of a relationship with a psychological person, characteristics of the individual, you see that his will was overborne, the Constitution was violated, and I'd submit to you that this is a textbook case of such a violation and that the rich should issue him. He should be given a trial without that coerced testimony. May it please the Court. Julie M. Yu for the respondent in this case. I would just like to address a couple of the points raised by Petitioner's Counsel. In particular, that Mr. Gorey was deeply mentally impaired. The fact of the matter is there's absolutely no evidence to that effect in the record with respect to the motion to suppress, the suppression hearing. He presented no expert testimony whatsoever about the extent to which he suffered from paranoid schizophrenia. The only testimony indicating that he did was that from Ms. Dobbins, who said that he was only paranoid, only acted paranoid when he was under the influence of drugs. And Mr. Gorey in the transcript indicated at one point that he was not using drugs while he was incarcerated. There's a claim that Mr. Gorey suffered from an IQ of 60. There was no evidence whatsoever to that effect in the suppression hearing. The only time that that was alluded to was at the trial. So if you're looking exclusively at the evidence offered at the motion to suppress where the state admittedly had the burden, but Mr. Gorey had an opportunity to present expert testimony about the extent of his mental impairments, there simply was nothing. With respect to the- Are we not allowed to rely upon the trial record as well? I don't believe so because what we're doing here, what the court is doing here is looking at the state court's decision with respect to the denial of the motion to suppress. That was what was taken up on appeal. That was what was decided by the Court of Appeals. In other words, in your view, we have to decide precisely what you say is so in order to affirm? Well, what I'm saying is that the court should look at the evidence that was presented at the motion to suppress because there that was the venue in which this issue was being litigated. There was some- Mr. Gorey is mentally retarded. And I don't know what you'd call it. I think the polite thing now is developmentally delayed. But you don't have to argue that he's not in order to- The question is whether a statement was voluntary. Admittedly so. And a person who is developmentally delayed can voluntarily make a statement, can't he? Admittedly so, I agree. You may be going somewhere that you don't have to go. And in my view, you can't go because we've got a record that we can't ignore, don't we? Well, and that very well may be correct. But what I would like to point out is that the context in which his- at the trial in which the issue of mental retardation was presented was not the venue in which this issue was being presented to the trial court. And so the state didn't have the same- I guess the state wasn't in a position to- wasn't presented with a situation to rebut that evidence. What's the question before us today, the narrow question? The narrow question, whether under the totality of the circumstances, his will was overborne. One step from that, isn't it, because- Well, actually, yes, because the standard review is, yes, objectively unreasonable. We look at this through a certain kind of lens. And that's something that's kind of immovable in a state habeas case these days. And as this court stated, that the state court decision must be more than merely or even clearly incorrect. And if you look at Schneckloth and other clearly established Supreme Court law on this issue and the facts of this case, then the state court's decision is just not objectively unreasonable. There was some discussion about his ability to think rationally during this conversation with Ms. Dobbins. And there's more evidence to that effect in addition to his discussion about how he's going to beat the robbery or the burglary charge. He also talked about how he was going to resolve the parole matter and how he was going to solicit help from California so that he could take care of that matter. So he was certainly savvy to not just the issue of how to defend himself in this other criminal matter, but also how to resolve another pending case. In addition, I'd like to point to some other portions of the record in which he establishes that he's certainly functional enough to render his statements voluntary. One of the most important aspects of this case is that this was not a situation in which Ms. Dobbins had the upper hand the entire time. She was a victim of domestic violence and was in a horribly terrifying situation with him for two weeks in which he held her and her children captive and then essentially came at her with a roofing hatchet. And throughout the course of this conversation, he continued to exhibit this controlling attitude that he had over her. He instructed her not to associate with certain people. He asked her whether she was cheating on him. He asked her why she had changed her appearance and her glasses. So it was not a situation where he was completely at the mercy of this woman who had come to see him. In addition to that, I would simply rest on the other arguments that I set forth in my brief unless the Court has any additional questions. It appears not. Thank you for your argument. Thank you. We'll give you a minute for rebuttal. Largely, the dysfunctional relationship they had, I would submit, is a red herring, although Ms. Dobbins testified that she was vastly ahead of him in terms of his functioning and her emotional functioning as well as her mental health. The record does reflect his paranoid schizophrenia. She testified about that and that she told the detectives that prior to the interviews. That's on 268 of the excerpt of the record. On page 1003, during the second interview at the end of it, he's saying to her, and this was a part of the record in the hearing, baby, you call over there to the jail and tell them that he needs his medications. I went to see him. He's moody and shit. He needs his medications. He takes Thorazine. You tell them Thorazine and Benadryl, babe. They calm me down. I feel good now. I feel better. I got a visit. You go back there and make those calls. Yes, he is capable of having some plans and being rational in some ways, but she absolutely exploits her superior role and his mental weaknesses. That's exactly what Connolly and Spano condemn and submit to you that the contrary decision was unreasonable. The court was reasonable in suppressing in the one case. The state court unreasonably applied the standards in not suppressing in this case. Mr. Hester, I guess you gather that the thing he was asking her to get for him were things he needed to treat his mental illness. Yes. Is that a reasonable conclusion from this record? Yes, it is. I mean, in the third page of the first interview. He was asking for drugs which he identified specifically that he needed to take because he liked to take them. He was a daddy. Well, and Thorazine is particularly used to treat paranoid schizophrenia. I've cited the DSM-IV regarding that in my brief. I've also discussed the testimony that was at the trial of the psychiatrist who saw him, who said he was incoherent when I first saw him. When he wasn't being treated, later when he was back on his Thorazine, his reasoning was much tighter. Thank you. Thank both counsel for the arguments. The case just argued is submitted.
judges: Farris, Clifton, Bea